# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 9, 2008 Session

## STATE OF TENNESSEE v. RICKY TERRELL COX

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 8003-B    Joseph H. Walker, III, Judge**

_____

**No. W2007-01371-CCA-R3-CD  - Filed February 19, 2009**

_____

The Defendant-Appellant, Ricky Terrell Cox (hereinafter "Cox"), was convicted by a jury of three counts of especially aggravated kidnapping, a Class A felony, especially aggravated burglary, a Class B felony, attempted second degree murder, a Class B felony, aggravated assault, a Class C felony, and unlawful possession of a weapon by a convicted felon, a Class E felony.  He was sentenced to twenty-two years at one hundred percent for the three especially aggravated kidnapping convictions and four years at thirty percent for the aggravated assault convictions, to be served concurrently.  He was also sentenced to nine years at thirty percent for the especially aggravated burglary conviction, nine years at thirty percent for the attempted second degree murder conviction, and eighteen months at thirty percent for the unlawful possession of a weapon by a convicted felon, which were to be served concurrently to one another but consecutively to the especially aggravated kidnapping and aggravated assault convictions, for an effective sentence of thirty-one years.  On appeal, Cox argues that (1) the trial court erred by admitting his prior juvenile conviction for impeachment purposes, (2) the evidence was insufficient to support his convictions, (3) the State failed to prevent or correct the false testimony of two of the State's witnesses, and (4) the trial court erred by imposing consecutive sentencing.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Scott A. Lovelace, Ripley, Tennessee (at trial), and Ryan B. Feeney, Selmer, Tennessee (on appeal), for the appellant, Ricky Terrell Cox.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

**Trial.** Deputy Sheriff Steve Jackson of the Lauderdale County Sheriff's Department testified that he arrived at the Midway Market in Henning in response to Officer Herbert Jones' call for

assistance at approximately 11:50 p.m. on April 30, 2006. He saw Chris Alston, also known as "Big Memphis," in a frightened state with blood on his face, head, and shirt. Alston was whimpering and asked Deputy Jackson to check on his girlfriend and child at his house at 340 Johnson Street in Henning. When Deputy Jackson arrived at Alston's residence, he saw a large number of people coming and going from the rear of the home. He also saw a wooden door with a large rectangular windowpane that had been shattered. There was blood on the glass that was still intact, as well as blood on the shattered glass. He noticed broken glass inside and outside the door. He entered the residence through the back door and noticed blood all over the floor of the kitchen and saw two rounds of .380 caliber ammunition and a crowbar on the island in the kitchen. He also observed that some plastic from the front porch had been pushed inward, which could have allowed a person to access the front entrance of the house. He also found footprints in the area where the plastic had been broken. Deputy Jackson cleared the crime scene to ensure that the suspects were gone and to prevent the people present from tampering with the evidence. He then checked on Alston's girlfriend and child, who were in the master bedroom. They were "shaken" with no signs of injury. The child was three or four years old.

A short time later, Deputy Termaine Reed and Deputy Brian Robison arrived to secure the scene on the outskirts of the residence. In addition, Henning Police Chief Vincent Tyus and Special Agent Donna Turner with the Tennessee Bureau of Investigation arrived on the scene. Deputy Jackson, Chief Tyus, and Special Agent Turner recovered several items of evidence including the cord and motor from an electric air pump and an empty magazine or clip of a .380 semi-automatic pistol. They found the cord from the pump in the driveway of "Papa Levi's" residence at 133 Graves Avenue, which is located approximately eighty to one hundred and twenty feet from Alston's residence. At Levi's home, there was a bloodstain on the front door and drops of blood on the porch.

Deputy Jackson explained that the distance from Alston's residence to the Midway Market was approximately one-tenth of a mile, and that Alston could have run from his home to the Midway Market in a few seconds. He did not see Cox the night of April 30, 2006, and Alston did not give him a description of his assailants. There was no physical evidence that linked Cox or the other defendants to this case.

Henning Police Chief Vincent Tyus testified that he first saw Alston at Baptist-Lauderdale Hospital on April 30, 2006, at approximately midnight. Alston was "bruised up pretty bad"; he had blood coming from his head and ear, a gash on his foot, and a bruise on his leg. Chief Tyus took photographs of Alston's head, foot, face, both knees, and both shoulders at the hospital to show his condition.

When Chief Tyus arrived at Alston's residence, he saw Deputy Jackson and Agent Turner before going inside the home. He observed that the glass in the back door had been shattered, there was blood on the floor, and there was a crowbar in the center of the kitchen. He also saw that the plastic on the front porch had been cut in half. At Levi's house, he saw blood on the door and found the cord from an air compressor.

Chief Tyus explained that law enforcement initially was informed of this case when a neighbor heard Alston beating on her door and called 9-1-1. He did not check for fingerprints on

2

the .380 caliber cartridges that were recovered. Also, he did not get a description of Alston's assailants at the hospital because Alston was in so much pain that he did not question him at length. Chief Tyus said that Alston did tell him that some of his assailants got into his home by cutting the plastic around his front porch.

Lionel Crawford testified that he lived in Henning in April of 2006 and that Stanley Crawford, Ronnie Coleman, and Ricky Terrell Cox were his cousins. He explained that he knew Michael Hayes but was not related to him and that Stanley Crawford had "the mind of a child." He first saw Stanley Crawford and Ronnie Coleman on April 30, 2006, when he went to his grandmother's house to wash his car. He saw Michael Hayes and Ricky Cox at his grandmother's house later that day. While he was washing his car, Lionel Crawford heard Ronnie Coleman talking to Michael Hayes and Ricky Cox about robbing Chris Alston. Coleman was telling Hayes and Cox that Alston had cocaine and money at his home in Henning. Lionel Crawford told Coleman, Hayes, and Cox that Alston did not have drugs and money at his home and tried to convince them not to rob Alston. Cox and Hayes kept asking Ronnie Coleman if it was true that Alston had drugs and money, and Lionel Crawford told them, "No, y'all, Ronnie don't know what he is talking about. Y'all don't listen to him. Don't do it." Lionel Crawford stated that this conversation between Coleman, Cox, and Hayes took place sometime between 7:00 p.m. and 8:00 p.m. on April 30, 2006, and that Michael Hayes was wearing a blue jersey and Ricky Cox was wearing a black shirt and blue jeans that day. Lionel Crawford left the house between 8:30 p.m. and 9:00 p.m. to go to Ripley. As he was leaving, he saw Cox, Coleman, and Hayes together, and he saw Stanley Crawford sitting with his brother on the porch. He did not see Cox, Coleman, Hayes, or Stanley Crawford again that night.

Lionel Crawford said that he never heard Cox, Coleman, Hayes, or Stanley Crawford discuss the use of guns or any type of weapons in connection with the offenses against Alston. Regarding the likelihood that the robbery would actually happen, Lionel Crawford said, "I mean, I know them, you know – I know the type of guys they is [sic]. I was assuming they was [sic] serious about it."

Jennifer Paine, Chris Alston's girlfriend and the mother of Alston's son, testified that she and her son were living with Alston on April 30, 2006, when the burglary occurred. She and her son were in bed when they heard someone knocking on the door and ringing the doorbell sometime between 11:00 p.m. and 11:30 p.m. Alston went to the door while they stayed in bed. He then came back to bed but got up, stating that he was going to take a shower. Before he took a shower, Paine saw Alston look out the window. Then Alston went towards the kitchen, and she heard glass breaking and people screaming, "Police." The burglars broke the glass in the double doors in the kitchen at the back of the house. When she heard the glass breaking and the people yelling, "Police," Paine grabbed her son. She heard someone knocking at the front door, who she assumed was the police, and she opened the front door to find a black man with a gun. He had on a white shirt, black pants, and a "doo-rag" on his head. Paine knew he was not a police officer and asked him, "What [was] going on?" The man pointed the gun at her and her son and told them, "[B]e cool." She went into the bedroom, grabbed a blanket for her son, and started walking to the closet because that was her first instinct. She passed by a clock on the dresser which showed the time to be midnight, but she explained that it was really 11:45 p.m. because she sets her clock fifteen minutes fast. The man with the gun told her not to go into the closet, and then asked her, "Where is it? Where's the money at [sic]?" She told him

3

where her purse and her jewelry box were located. The man started pacing back and forth, and Paine's son kept asking for his father. At the time, she believed Alston was still in the kitchen because she could hear fighting and "scuffling" and heard him say, "[M]y girl and my baby are in there and it ain't [sic] nothing here." She could hear someone being hit and could hear people moving around on the floor. As she was hearing the noises from the kitchen, the man with the gun in the bedroom kept telling her, "You'll be cool [sic]. Don't move. I got something for you." Paine said that she never gave him any money or drugs. At the time, she believed that the man with the gun was going to kill her and her son. However, he did not hurt either one of them. She rocked her son back and forth and prayed that the men would not kill them. During this time, her son cried and asked for his father. She asked the man with the gun not to kill them, but he never answered her. She and her son were never free to leave the bedroom at any point. The man with the gun walked back and forth from the bedroom to the kitchen a couple of times, and she could hear him talking to the other men in the kitchen. She heard the man who had been in the bedroom with them saying, "Yeah, I got this in here." Then she saw him walk out of the bedroom. The house fell silent, and she said she was "sitting in the room in the dark waiting to see if somebody was going to come and kill [them] or not." She and her son sat in the dark for about five to seven minutes before Alston's cousin came into the bedroom and told her that Alston had made it to the Midway Market. Shortly thereafter, an officer with the Lauderdale County Sheriff's Office came into the house through the kitchen.

Paine said that when she had a chance to look around, she noticed broken glass in the kitchen, drops of blood everywhere, and open kitchen cabinets. She said that one of the back doors in the kitchen was heavily damaged. The plastic around the front porch was broken, but Paine said that it had been damaged before the burglary. The only thing taken from the house during the burglary was Alston's coat and wallet, which were not recovered. During her testimony, Paine identified Cox as the man who had held her and her son at gunpoint in the bedroom. She did not see the other men involved in the burglary.

Following the burglary, Paine did not know Alston's location or condition. By the time she got to the Midway Market, Alston was bleeding on a stretcher in the ambulance. She saw him later at Baptist-Lauderdale Hospital.

Chris Alston testified that he lived with Jennifer Paine and their son at 340 Johnson Street in Henning on April 30, 2006. Alston first saw Stanley Crawford when he rang his doorbell around 11:30 or 11:45 p.m. on April 30, 2006. Alston had been watching television when he heard someone ringing the doorbell over and over. He finally opened the door, and asked, "What?" Stanley Crawford told him he wanted "a blunt," and Alston told him, "You know I don't sell no [sic] damn weed." Stanley Crawford was acting nervous, and as he walked away, he tried to look behind Alston's house. Alston knew Stanley Crawford because he was from Henning. As Crawford was walking away, Alston looked out the bathroom window in the same direction Crawford had been looking. He then heard glass breaking and some men yelling, "Police." Alston said that he was wearing "some blue shorts" and that one of the men "grabbed [him] by his shirt. He had the gun--" An instant later, Alston clarified his testimony and said, "I didn't have on no [sic] shirt. He grabbed me." One of the men asked him for the drugs and money. Alston said, "What?" The man responded, "You know what I'm talking about." Then one of the men hit Alston's knee with a crowbar. Alston told the men, "I don't have none [sic]," and the men said, "You [are] lying." Alston said one man had

4

a crowbar and another man had a gun. Alston identified Cox as the man with the gun.

Alston fell down after he was hit with the crowbar, and the men tied him up. They kept asking him, "Where it at [sic]?" Alston kept telling them, "I don't have nothing [sic]." Alston said that the men started kicking him, and Cox hit him in the top of the head with a pistol that looked like a "black .45." At that point, Alston noticed that blood was running down his face. The men kept asking him for the drugs and the money, and he kept telling them that he did not have either of these things. Then Alston told them to look in the kitchen cabinets to keep them from hitting him as he was trying to "figure out" what to do next. Once the men realized that there was nothing in the cabinets, one of the men said, "You're going to tell me where it's at [sic]" and started walking toward the bedroom where Alston's son and girlfriend were located. The man with the crowbar walked away from Alston and began looking through the broken glass at the back door as if he had lost something. Alston said that they tied him with his hands behind his back and one of his legs tied up to his hands with an extension cord. The men hit him with the crowbar once, kicked him four or five times, and hit him with the gun about four or five times. They never found any drugs or money in his kitchen. Alston stated that he thought he was going to die two or three times in the house. He had no doubt that Cox was the person who pointed the gun at him and "hog-tied" him in his kitchen. He also identified Michael Hayes as the other assailant.

Alston said that when he was lying on his stomach, he could see what the men were doing. One of the men left the kitchen, and the other man seemed to be looking for something in the broken glass. Alston got the cord loose and ran out the back door to "Papa Levi's" house. Hayes and Cox followed him to Levi's house where they fell, and Alston started wrestling with Cox for the gun. Then Alston broke free and banged on Levi's window screaming, "Pop!" Hayes put Alston's arm behind his back, and Cox grabbed the gun and put it in his face. Cox tried to shoot Alston, but the gun jammed. Alston said a woman opened Levi's door but slammed it when she saw the men fighting. After the gun jammed, Hayes and Cox ran in one direction, while Alston ran toward the Midway Market. Alston said that Hayes was the man who hit him with a crowbar and held his arm behind him as Cox tried to shoot him. He said that Hayes had on a "Sammy Sosa" jersey with red trim that night.

Alston said that once he arrived at the Midway Market, the Henning police were already there, and he recognized one of the officers. Later, Deputy Steve Jackson with the Lauderdale Sheriff's Department arrived.

During his testimony, Alston read from his statement to police describing the man with the gun: "A light skinned guy with built chest, stocky looking, low haircut. Clean cut. He had a gun in his left hand." Alston testified that he was six feet, two inches tall and that the man with the gun was a little taller than he. Alston did not give this statement to police until three weeks after the incident because he was hurt and was taking medication. He thought that Cox was wearing all black that night, although he was not certain. He recognized Cox because they had recently been in jail together.

Donna Turner testified that she was a Special Agent with the Tennessee Bureau of Investigation when this incident occurred. On April 30, 2006, she was called by Henning Police

Chief Tyus and the Lauderdale Sheriff's Department to go to 340 Johnson Street in Henning. She arrived at around 1:15 a.m. on May 1, 2006, only a short time after the incident occurred. When she arrived, she observed yellow tape around the perimeter of the house. She encountered Deputy Jackson, who started telling her about the case. Turner went into the house and did a preliminary walk-through of the crime scene to determine if someone with special training in a particular area needed to be called to the scene.

She observed glass and blood all over the kitchen. There was a new crowbar in the kitchen that seemed very out of place. She saw two .380 caliber bullets that had not been fired. She was particularly interested in the different areas of blood and their proximity to the back door and kitchen counter. There was no glass in one of the back doors, and the mini-blinds covering the door were damaged. The glass had shattered into very small pieces all over the ground. The door frame was locked, but the glass in it was shattered, and the majority of the glass was on the inside of the home. Turner photographed the areas of blood. She noticed a single blood stain that was near the sink and another bullet casing in that area. All of the blood was on the lower part of the cabinets and the floor. The different areas of blood indicated that the person bleeding had moved. Turner said that she found the handgun magazine, the electrical cord, parts of the air compressor, and blood transfers on the cars in Levi's garage. Turner said that the recovered items, including the magazine, crowbar, cartridge, candlestick holder, duct tape, hose, motor, electrical cord, and cover to the air compressor, were all sent for fingerprint analysis but contained no identifiable prints.

The first suspect that Turner talked to was Stanley Crawford. From Crawford, she learned that Ronnie Coleman, and two individuals named "Ricky" and "Mike" were also involved. Crawford was unable to give the last names for these two men. Turner said that they viewed the video surveillance from the Midway Market showing Stanley Crawford and another man, wearing a "Sosa" jersey, entering the store at 7:48 p.m. and exiting the store at 7:53 p.m. Turner took a photograph of the surveillance computer screen showing the man in the blue "Sammy Sosa" jersey at the Midway Market. Turner identified the man in the jersey as Michael Hayes.

Turner stated that Stanley Crawford was advised of his rights on May 1, 2006. He was detained from 9:31 a.m. to 2:23 p.m., and she interviewed him during part of that time. Stanley Crawford was unable to write his own statement, so an officer wrote the statement for him based on what he said about the incident, and then read it to him before Crawford signed it. Turner stated that Crawford appeared competent to give a statement at the time.

Michael Hayes testified that he was with Ricky Cox on April 30, 2006. Hayes stated that he heard Coleman talking to Cox about robbing Alston. Hayes said that he last saw Cox on April 30, 2006, when he left to go to the store at 7:30 p.m. When he returned to Cox's aunt's house, Cox was no longer there. Hayes said that he pled guilty to the charge of attempted second degree murder of Alston prior to testifying at Cox's trial because it was in his best interest. Hayes said that he had no involvement in the incident and left town at almost 10:00 p.m. that night. However, he admitted that he was the man in the "Sosa" jersey from the photograph taken from the Midway Market surveillance camera. He also said that the man with him in that photograph was Stanley Crawford. Hayes was aware that Stanley Crawford had pled guilty to some charges and that Ronnie Coleman had pled guilty to one charge related this incident.

6

Ricky Cox testified that he was in Henning on April 30, 2006, to visit his family. He saw Ronnie Coleman, his cousin, and Michael Hayes, a friend, that day. He visited his family and went back home to West Memphis, Arkansas between 7:00 p.m. and 7:30 p.m. that night. He dropped Coleman off and went home. He started drinking beer and Henessey with his friends. Then he left his house at around midnight and went to his girlfriend's house, where he spent the night. Cox said that he discovered he was facing charges in Lauderdale County while he was incarcerated for a ticket. He said that Special Agent Turner asked him some questions about the April 30, 2006 incident, but that he did not give a statement because he did not know anything about the incident. He denied having any involvement in offenses against Chris Alston and his family. Cox acknowledged that he had been in jail with Alston but claimed he did not recognize him. He said that Alston never acted like he recognized him either. Cox said that he was right-handed and five feet, seven inches tall.

Cox admitted that he was convicted of armed robbery in Cook County, Illinois, on May 1, 2000, when he was sixteen years old. Cox said that he was near Ronnie Coleman and Michael Hayes on April 30, 2006, but did not listen to what they were saying because he was talking with a family member. He claimed that Lionel Crawford testified that Cox had asked questions about the robbery because Lionel Crawford was afraid of Alston's friends. Cox also said that although Stanley Crawford's statement to the Tennessee Bureau of Investigation stated that Cox, Michael Hayes, Ronnie Coleman, and Stanley Crawford were involved in the attempted robbery, he claimed that Stanley Crawford did not know what he was signing. He further claimed that Ronnie Coleman pled guilty because of his criminal record, and Michael Hayes pled guilty to attempted second degree murder of Alston because he entered a best interest plea. Cox acknowledged that Alston and Paine identified him but noted that Paine said she let Cox in through the front door while Alston said Cox came in through the back door.

**I. Motion in Limine.** Cox argues that the trial court abused its discretion in overruling his motion in limine regarding his previous juvenile conviction. First, he contends that Rule 609(d) of the Tennessee Rules of Evidence precludes the use of a juvenile adjudication to impeach the accused. Second, he asserts that the use of juvenile convictions for the purpose of impeachment is specifically proscribed by Tennessee Code Annotated section 37-1-133(b) (2006). Third, he contends that his juvenile conviction for armed robbery was exceedingly prejudicial, and its admission cannot be considered harmless error. The State responds by contending that Cox waived this issue when he withdrew his motion in limine during trial on the basis that it was "the only [prior] conviction" after he was presented with a "Certified Statement of Conviction" for armed robbery in Illinois. See Tenn. R. App. P. 36(a), 24(b). Second, the State argues that admission of the prior conviction was proper because Cox was convicted of the offense of armed robbery as an adult, even though he had not attained the age of eighteen years at the time of the conviction. See State v. McGhee, 746 S.W.2d 460, 463-64 (Tenn. 1988). Third, the State contends that the trial court followed all the requirements of Rule 609 of the Tennessee Rules of Evidence. Fourth, the State asserts that robbery and theft are crimes of dishonesty and are probative of a defendant's credibility. See State v. Blevins, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997); see also State v. Galmore, 994 S.W.2d 120, 122 (Tenn. 1999); State v. Caruthers, 676 S.W.2d 935, 940-41 (Tenn. 1984); State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997). Finally, the State argues that the jury would have been informed of the prior conviction in any event because it is an element of the offense of possession of a weapon by a

convicted felon.  See T.C.A. § 39-17-1307.

Cox filed a motion in limine to prevent the State from using a prior conviction for armed robbery while a juvenile for impeachment purposes.  However, the record shows that at trial the State presented Cox with a "Certified Statement of Conviction" for armed robbery as a juvenile in Cook County, Illinois, in May of 2000, for which he was sentenced as an adult.  Consequently, defense counsel stated, "We will withdraw the Motion in Limine because that's the only conviction."  The trial court responded:

> The State filed a notice of intent to seek enhanced punishment [and] for [the purpose] of impeachment of the prior record of the defendant. . . . [S]ince the one they gave notice of is also an element of the offense of Count Nine [unlawful possession of a weapon by a convicted felon] and admitted by Exhibit 21, the Court finds that should the defendant take the stand, [the State] would be allowed to ask if he is the same defendant that has the conviction, that the jury can consider [the conviction] both as an element of the offense in Count Nine and also for impeachment purposes. Normally, the Court would weigh that as to whether it was probative of credibility[,] and it is probative of credibility.  It is an armed robbery conviction.  It is probative of credibility and normally it might be – the probative value might be outweighed by the potential prejudice to similar matters for which he is on trial, except it's admissible in any event as an element of the events of Count Nine.

Cox did not make any further objections to the admissibility of this conviction until his motion for a new trial when he claimed the trial court erred in admitting this prior conviction because it was a juvenile adjudication.  We note that the trial court's order denying the motion for a new trial does not directly consider this issue.  In addition, the transcript from the hearing on the motion for a new trial is not included in the record.  The State insists that this issue should be waived because of Cox's failure to object at trial and because of his failure to include the transcript from the motion for a new trial in the record.  We agree.  See Tenn. R. App. P. 36(a).  Because we do not have a transcript of the motion for new trial, we are simply unable to determine whether the grounds urged to exclude the prior conviction before the trial court are the same as presented to this court on appeal.  It is the duty of the appellant to provide a record which conveys a fair, accurate and complete account of what transpired with regard to the issues which form the basis of the appeal.  Tenn. R. App. P. 24(b); see State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999).  When no transcript is included in the record, this Court must presume that the ruling of the trial court is correct.  See State v. Ballard, 855 S.W.2d 557, 561 (Tenn. 1993); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App.1991).  Accordingly, this issue is waived.

**II. Sufficiency of the Evidence.**  Cox contends that the evidence at trial was insufficient to support his convictions because the evidence consisted of the "contradictory" and "inconsistent" testimony of Chris Alston and Jennifer Paine regarding Cox's involvement in the offenses and that neither witness's testimony is sufficient to convict him.  In addition, he argues that the evidence was also insufficient to support his conviction of felon in possession of a handgun, since the underlying felony was a juvenile conviction.  The State argues that the "rule of cancellation" employed by Cox,

which states that conflicting statements by a witness regarding the same fact cancel one another out, is inapplicable because that rule refers to the testimony of a single witness, rather than two different witnesses. See State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993). Second, the State asserts that although Alston's statement to police regarding the height of the attacker conflicted with his testimony at trial, the rule of cancellation is only applicable to sworn testimony. Third, the State argues that "there was a possible explanation" reconciling Alston's and Paine's testimony and that other evidence corroborated their testimony at trial. Fourth, the State contends that Cox's convictions did not require him to be personally responsible for the crimes against Paine and her child; under the theory of criminal responsibility, Cox could be responsible for the especially aggravated kidnapping and aggravated assault against Paine and her child even if he only took part in the burglary and aggravated assault of Alston. See T.C.A. §§ 39-11-401(a) (2006), -402(2) (2006).

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977), and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978)), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

Cox argues that the "contradictory" and "inconsistent" testimony of Chris Alston and Jennifer Paine was insufficient to support his convictions because it failed to prove that Cox was one of the individuals that burglarized Alston's home. Specifically, he focuses on the fact that Alston described his assailant as taller than six feet, two inches and holding the gun in his left hand while Cox testified that he was five feet, seven inches tall and right-handed. In addition, Cox asserts that the testimony of Jennifer Paine was inconsistent with the testimony of Chris Alston. Paine stated that the individual who held her and her son at gunpoint in the bedroom was Cox while Alston stated that Cox was one

9

of his assailants in the kitchen.

This court has previously concluded that a witness's testimony may be discredited only in extraordinary circumstances:

> [A]lthough as a general rule a conviction may rest upon the testimony of a single witness, though it be contradicted by others or appear uncertain or inconsistent, the rule does not apply if the testimony of such single witness is not of a cogent and conclusive nature, and "if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon."

Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (quoting 23 C.J.S. Criminal Law § 903(19)). This court has additionally held that "contradictory statements by a witness in connection with the same fact cancel each other." State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993). However, the rule of cancellation applies "only when the inconsistency in the witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence." Taylor v. Nashville Banner Pub. Co., 573 S.W.2d 476, 483 (Tenn. App. 1978). "The rule of cancellation is typically limited to circumstances in which the witness has sworn to each statement." State v. Joseph Vermeal, No. M2005-00568-CCA-R3-CD, 2005 WL 3543417, at *4 (Tenn. Crim. App., at Nashville, Dec. 28, 2005) (citing State v. Cayle Wayne Harris, No. M2000-02143-CCA-R3-CD, 2001 WL 1218582, at *2 (Tenn. Crim. App., at Nashville, Oct. 12, 2001)), aff'd denial of post-conviction relief, No. M2007-01676-CCA-R3-PC, 2008 WL 2648939 (Tenn. Crim. App., at Nashville, July 3, 2008)).

Cox argues that the testimony from Paine and Alston conflict and should cancel each other. However, as the State correctly argues, the rule of cancellation applies to the testimony of one witness, not two different witnesses. Further, "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence are resolved by the trier of fact, not this Court." State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987) (citations omitted). Accordingly, even if the testimony of Paine and Alston was somewhat contradictory, it was the jury's duty to consider the conflicting testimony and to evaluate Paine's and Alston's credibility. Cox also argues that Alston's testimony at trial was inconsistent with his statement to police. Again, Cox invites this court to substitute our judgment for that of the jury's. Cox's defense attorney cross-examined Alston on the inconsistencies between his testimony and his statement to police, and the jury resolved any inconsistencies in the evidence. Further, the record does not show that Alston's statement to police was a sworn statement. Therefore, even if Alston's statement contradicted portions of his testimony at trial, the rule of cancellation would not apply.

In addition, we conclude that the rule of cancellation does not apply in this case because, as argued by the State, the evidence at trial provided a "possible explanation for the [conflicting]

testimony" of Paine and Alston. Alston testified that while he was lying down on the kitchen floor he saw one of the men leave the kitchen and go back to the bedroom where Paine and their son were located. A jury could reasonably find that Cox entered the kitchen at the back door with Michael Hayes and then searched for Paine and encountered her at the front door, before holding Paine and her son at gunpoint in the bedroom. Accordingly, Cox is not entitled to relief.

The State further contends that Cox could be held responsible for the acts of his co-defendant through the theory of criminal responsibility. An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2) (2003). Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). In the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred." State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "no particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." Id. (citing Ball, 973 S.W.2d at 293)). In order to be held criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976) (quoting Jenkins v. State, 509 S.W.2d 240, 244-45 (Tenn. Crim. App. 1974)). During Cox's trial, the jury was instructed on the theory of criminal responsibility. Even if Paine misidentified Cox as the individual who held her and her son at gunpoint in the bedroom, Alston's testimony would be sufficient to convict Cox for the offenses relating to Paine and her child through the theory of criminal responsibility. Conversely, even if Alston misidentified Cox as one of his assailants in the kitchen, Paine's testimony would be sufficient to convict Cox for the offenses relating to Alston through the theory of criminal responsibility.

**III. New Trial.** Cox argues that his due process rights to a fair and impartial trial were violated when the State used the false testimony of either Chris Alston or Jennifer Paine to convict him. He contends that the district attorney has a duty to correct false testimony of State witnesses. He also asserts that the State used the testimony of Alston and Paine to convict him, even though their testimony was completely contradictory. Cox argues that "the State in this case, at best, failed to correct the false testimony of Jennifer Paine, and at worst, placed her testimony before the jury with knowledge of its falsity." The State argues that although the testimony of Alston and Paine might be somewhat conflicted, the fact that Alston stated that one of his attackers left the kitchen resolves any inconsistencies in their testimony and that Cox has failed to show that Paine "knowingly lied during her testimony and that the State was aware that she lied." See Roger Morris Bell v. State, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App., at Knoxville, Mar. 15, 1995), perm. to appeal denied (Tenn. Aug. 28, 1995).

This court has held that "[w]hen a state witness answers questions on either direct or cross examination falsely, the district attorney general, or his assistant, has an affirmative duty to correct the false testimony." State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993) (citations omitted). This affirmative duty applies regardless of whether the district attorney general solicited the false testimony. Id. at 618 (citing United States v. Barham, 595 F.2d 231, 232 (5th Cir. 1979)). If the State fails to correct the witness's false testimony, then the defendant's due process rights are violated. Id. (citing Giglio v. United States, 405 U.S.150, 153-54, 92 S. Ct.763, 766 (1972); Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct.1173, 1177 (1959)). This affirmative duty also applies "when the false testimony is given in response to questions propounded by defense counsel for the purpose of impeaching the witness." Id. at 617 (citations omitted). The State correctly notes that in order to prevail on a claim that the State failed to correct false testimony, the defendant must prove the following by a preponderance of the evidence: "(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." Roger Morris Bell, 1995 WL 113420, at *8. We conclude that Cox failed to prove any of the aforementioned factors by a preponderance of the evidence. Cox provides no proof that Paine testified falsely at trial and that the State knew of this false testimony. Instead, he generally argues that Paine's testimony was "inconsistent" with Alston's testimony but fails to address any possible resolution of their testimony. He also fails to address the State's contention that the jury could have found Cox guilty of the offenses against Paine and her son under the theory of criminal responsibility. Accordingly, we conclude that Cox is not entitled to relief on this issue.

**IV.  Consecutive Sentences.**  Cox argues that the trial court erred in imposing consecutive sentences because there was no proof he was on probation or parole for his juvenile felony conviction at the time of the instant offenses. He also contends that this case should not be reviewed de novo with a presumption of correctness because of the trial court's conclusion that he was on release status at the time he committed the instant offenses. Because the trial court did not indicate the weight given to this factor, he asks that the trial court's decision be reversed, or, alternatively, that his case be remanded for a re-sentencing hearing. In response, the State argues that the record fully supports consecutive sentencing based on Tennessee Code Annotated sections 40-35-115(b)(2), (4) (2006).

At Cox's sentencing hearing, the trial court explained its reasoning for imposing consecutive sentences:

> The Court finds, under T.C.A. 40-35-115[(b)(2)], that the defendant is an offender who has a record of criminal activity, [and under Tennessee Code Annotated section 40-35-115(b)(4),] he's a dangerous offender whose behavior indicates little or no regard for human life, that consecutive sentencing is reasonably related to the severity of the offenses committed and serve[s] to protect the public from further criminal acts by someone such as this defendant who resorts to aggravated criminal conduct, and be congruent with the principles of sentencing.

12

In addition, the defendant received a sentence of six years [for armed robbery in Cook County, Illinois] in May of 2000. [The instant offenses] occurred in April of 2006. So the defendant was on release status in Docket Number 99CR10472 out of Cook County Circuit Court; and that, under T.C.A. 40-35-115 [(b)(6), "[t]he defendant is sentenced for an offense committed while on probation,"] could also be applied.

And the Court finds that consecutive sentencing is reasonably related to the criminal conduct, and sentences the defendant in Count 4, Count 8, and Count 9, consecutive to Counts 1, 2, and 3. . . .

Tennessee's amended sentencing act became effective June 7, 2005. Because the offenses in this case occurred on April 30, 2006, the 2005 amended sentencing act governs this case. Regarding the impact of the 2005 amended sentencing act, the Tennessee Supreme Court has stated:

The amended statute no longer imposes a presumptive sentence. Rather, the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." Id. § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," id. § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," id. § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," id. § 40-35-103(5).

State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Further, the court concluded, "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant, not the State, has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d) (2006), Sentencing Commission Comments. The record indicates that our review will be de novo with a presumption of correctness.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a) (2006). A trial court may order multiple offenses to be served consecutively if it finds by a

preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2).

Here, the trial court imposed consecutive sentencing based on Tennessee Code Annotated sections 40-35-115(b)(2), (4), and (6) (2006). We conclude that the trial court properly ordered consecutive sentencing based on section 40-35-115(b)(4), "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Regarding this subsection, the Tennessee Supreme Court has stated:

> Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.

State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn.1995)) (emphasis added). Unlike the other six subsections, the trial court must make additional factual findings for the "dangerous offender" factor because it is "the most subjective and hardest to apply." Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)). In explaining its decision to order consecutive sentencing, the trial court found that "consecutive sentencing is reasonably related to the severity of the offenses committed and serve[s] to protect the public from further criminal acts by someone such as this defendant who resorts to aggravated criminal conduct." Regarding the severity of the offense, the trial court stated, "I've considered the nature and circumstances of the offense, including the Victim Impact Statement. Again, the court recalls the testimony of how a home invasion was made here in Lauderdale County by individuals alleging to be police officers, the terrorizing of a family, the brutal beating of the victim." The record shows that the trial court made the additional factual findings required of this factor regarding the severity of the offense and the need to protect the public from future acts of the defendant. The trial court properly applied this factor. Accordingly, we conclude that the trial court did not err in ordering partial consecutive sentencing in this case.

## Conclusion

We conclude that the trial court did not err by admitting Cox's prior conviction for armed robbery for impeachment purposes, that the evidence was sufficient to support his conviction, that

the State did not knowingly present false testimony, and that the trial court did not err by imposing consecutive sentencing.  Upon review, we affirm the judgments of the trial court

_____
CAMILLE R. McMULLEN, JUDGE